UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAYLILY FARMS, INC., *et al* <br><br> Plaintiffs, <br><br> v. <br><br> ELAINE L. CHAO, United States Department of Labor, *et al*, <br><br> Defendants. | CIVIL ACTION <br> NO. 04-11002-GAO |

**DEFENDANT UNITED STATES'
OPPOSITION TO PLAINTIFFS'
REQUEST FOR PRELIMINARY RELIEF[1]**

INTRODUCTION

Plaintiffs are owners of businesses on Martha's Vineyard, Massachusetts, who seek the assistance of this Court in employing "H-2B" temporary foreign workers for the summer season. Plaintiffs petitioned the U.S. Department of Labor for a certification that hiring foreign temporary workers will not displace any qualified U.S. workers or adversely affect the wages and working conditions of such workers, and the Department of Labor so certified. However, on March 9, 2004, the Department of Homeland Security, U.S. Citizenship and Immigration Services ("USCIS") announced that it had

---

[1] The named defendants are Elaine L. Chao, Secretary of the U.S. Department of Labor, and Eduardo Aguirre, Jr., Director of the U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security.

received enough petitions from employers seeking H-2B temporary workers to meet this year's annual statutory cap of 66,000 temporary foreign workers and that the USCIS would no longer accept H-2B petitions after that day. Accordingly, Plaintiffs claim they are unable to obtain new H-2B temporary workers at this time.

Plaintiffs contend that the application of the statutory cap to their request for H2B workers is inequitable and unconstitutional. As shown below, Defendants' conduct with respect to Plaintiffs' petitions was in accordance with all applicable statutes, regulations, and formal agency guidelines and procedures. Plaintiffs cannot show that any pertinent statute is unconstitutional, and they cannot show that Defendants' regulations and formal guidelines and procedures are arbitrary and capricious or irrational. Plaintiffs complain of the equitable result of Defendants' use of the applicable law, regulations and policies, which allotted a large proportion of the 66,000 H2-B workers for FY 2004 to employers who needed them earlier in the year. Although Plaintiffs' grievances are understandable, Defendants' conduct was entirely lawful, no judicial remedy is available to Plaintiffs and their recourse lies elsewhere.

## LEGAL FRAMEWORK

This case arises under the H-2B program, which provides for the admission of temporary nonimmigrant foreign workers to perform nonagricultural or seasonal labor or

services.[2] See Section 101(a)(15)(H)(ii)(b) of the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1101(a)(15) (H)(ii)(b). Pursuant to the INA, the Secretary of the Department of Homeland Security ("DHS")[3] is authorized, after consultation with appropriate agencies, to grant petitions from employers seeking nonimmigrant aliens who fit into one of several categories specified in 8 U.S.C. § 1184(a),(c)(1), 1101(a)(15). The "H-2B" category describes a nonimmigrant temporary worker as:

> (ii) an alien having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform temporary services or labor, if unemployed persons capable of performing such service or labor cannot be found in this country. . . .

8 U.S.C. § 1101(a)(15)(H)(ii)(b).

The purpose of the "H" temporary worker category for foreign workers, is to give the Attorney General sufficient authority to admit temporary workers to alleviate labor shortages as they exist or may develop in certain areas or branches, particularly in periods of intensified production. H.R. Rep. No. 1365, 82nd Cong., 2d Sess. (1952), *reprinted in* 1952 U.S. Code Cong.&Ad. News (USCCAN) 1697-98. It was designed to balance the

---

[2] The H-2A program applies to agricultural foreign workers.

[3] The Homeland Security Act of 2002, Public Law 107-296, transferred the adjudications functions of the Commissioner of the Immigration and Naturalization Service to the Bureau of Citizenship and Immigration Services in the U.S. Department of Homeland Security. 6 U.S.C. § 271. USCIS processes most immigrant and nonimmigrant benefits provided to foreign nationals admitted to or within the United States.

effect of foreign labor on the domestic workforce with the country's need for skilled laborers. Id. at 1697-98, 1705.[4] In 1965, the H category in the statute was amended so that alien labor may be admitted only if DOL finds that American labor would not be adversely affected by the entry. Pub. L. No. 89-236 (1965). In that connection, Congress indicated that the purpose of the change was to strengthen the protection of American labor. S. Rep. No. 748, 89th Cong., 1st Sess. (1965) 1965 USCCAN 3328, 3333, as cited in Internat'l Union of Bricklayers and Allied Craftsmen v. Meese, 761 F.2d 798, 804 (D.C. Cir. 1985) (Congress has . . . been concerned with the impact of competition by foreigners on the American labor force since 1885, and has passed increasingly restrictive legislation on the entry of nonimmigrant alien workers.). See also, Internat'l Longshoremen's and Warehousemen's Union v. Meese, 891 F.2d 1374, 1383 (9th Cir. 1989) (citing Congress' purpose of protecting American laborers from an influx of skilled and unskilled labor). As noted in Digilab, Inc. v. Sec'y of Labor, 495 F.2d 323 (1st Cir.

---

[4] In 1986, the H-2 section of the statute was amended to distinguish agricultural workers from nonagricultural workers. See Immigration Reform and Control Act (IRCA), Pub. L. No. 99-603, 100 Stat. 3411, § 301(a). At that time, Congress reiterated, as to agricultural workers, the desire to facilitate the entrance of temporary workers to alleviate the labor shortages and at the same time avoid the abuses of allowing employers to import cheap labor and adversely affect the domestic agricultural workforce. See H.R. 99-682(I), 99th Cong., 2d Sess. (1986), *reprinted in* 1986 USCCAN 5649, 5654-55, 5683-87, and 5701-02. The Department of Justice, speaking in support of the legislation, articulated again the need to balance the needs of the U.S. agricultural producers against any rule that would create an incentive for employers to hire foreign workers over domestic laborers. See remarks of Edwin Meese, III, H.R. Rep. No. 99-682(I), 99th Cong., 2d Sess. (1986), *reprinted in 1986* USCCAN 5649, 5710.

1974), 8 U.S.C. §1182(a)(14) has two praiseworthy congressional objectives to be reconciled: (1) to admit . . . skilled workers from other lands who would make a contribution to our society, and (2) to protect our own workers by excluding aliens whose entry might deprive our citizens of comparable jobs.

DOL is required to attempt to reconcile these objectives in its consideration of whether there are sufficient workers able, willing, and qualified to perform the jobs for which employers seek temporary foreign workers. Id. DOL is required to advise DHS regarding whether admission of H-2B workers will have an adverse effect on U.S. workers. 8 U.S.C. § 1101(a)(15)(H)(ii)(B). See Declaration of Dolores DeHaan, Employment and Training Administration, DOL, ¶ 3.

DOL regulations require the would-be employer of H-2B workers to file an application at the local office of the State employment service serving the area of proposed employment, showing the employer's attempts to recruit workers and the appropriateness of the wages and working conditions offered. 20 C.F.R. § 655.2. According to DOL policy, the employer is permitted to file a labor certification application only within 120 days before the worker is needed by the employer. This DOL policy, set forth in General Administrative Letter ("GAL") 01-95, Exhibit 1,[5] has been in

---

[5] GALs are administrative orders by which the Employment and Training Administration of the Department of Labor issues interpretative guidance to its Regional Offices. GAL 01-95, Procedures for H-2B Temporary Labor Certification in Nonagricultural Occupations, (November 10, 1994), 60 Fed. Reg. 7216 (February 7,
(continued...)

effect since approximately 1984 and is applicable to all applications filed under the H-2B program.[6] DeHaan Decl. §§ 9-11. The prohibition on filing applications for temporary labor certifications more than 120 days before the workers are needed is necessary because the availability of temporary workers in the United States changes over short periods of time and an adequate survey of the labor market cannot be made for a longer period. DeHaan Decl.§ 10. 60 Fed. Reg. 7216, 7217(1995).[7]

When DOL certifies an employer's application for H-2B workers, DOL is "advising" the director of USCIS on whether or not United States workers capable of performing the temporary services or labor are available and whether or not the alien's employment will adversely affect the wages and working conditions of similarly employed United States workers. 8 C.F.R. § 214.2(h)(6)(iii). See GAL, V.A. Exhibit 1.

---

(...continued)
1995).

[6] The GAL provides that [u]nless the Certifying Officer specifies otherwise, the SESA should return to employers requests for temporary labor certification filed more than 120 days before the worker is needed and advise them to refile the application no more than 120 days before the worker is needed. This is necessary since the availability of temporary U.S. workers changes over short periods of time and an adequate test of the labor market cannot be made for a longer period. 60 Fed. Reg. 7216, 7217. This requirement reflects DOL s program experience that an adequate test of the domestic labor market for a temporary position cannot occur more than four months before date of need and therefore would not permit DOL to meet its responsibility to determine domestic worker availability. DeHaan Decl. § 10.

[7] Employers seeking foreign agricultural workers under section H-1B, must wait until 60 days before their need for the workers, and do not have the advantage of a 120 day advance period.

The DOL Regional Administrator approves the employer's application for certification "if he or she finds that qualified persons in the United States are not available and that the terms of employment will not adversely affect the wages and working conditions of workers in the United States similarly employed." 20 C.F.R. § 655.3(a).

Once DOL has certified the application, the employer must file a petition for an H-2B nonimmigrant worker (Form I-129) with USCIS. 8 C.F.R. § 214.2(h)(6)(iv)(A)(1) & (2). The USCIS has the responsibility for adjudicating such petitions for H-2B workers and according aliens such status. GAL 01-95, Section I.C. Exhibit 1.[8] Admission of H-2B workers to the United States is limited by statute to 66,000 per year. 8 U.S.C. § 1184(g)(1)(B).

## STATEMENT OF FACTS

Plaintiffs each applied to DOL for certification that there were insufficient available domestic workers for the positions they wished to fill for the summer 2004 season and that their employment of temporary foreign workers would not adversely affect the wages and working conditions of domestic workers similarly employed. 8 U.S.C. §1182(a)(14). DeHaan Decl. § 12.[9] Their applications were filed after

---

[8] The USCIS is not bound by DOL's certification or notice that certification cannot be made. 8 C.F.R. § 214.2(h)(6)(iv)(A), (D), and (E). However, USCIS will give deference to DOL's certification in most cases.

[9] The exception is Plaintiff Jerry Wiener, for whom DOL has no record of any H-2B application. DeHaan Decl. § 13.

7

November 15, 2003, within 120 days of the summer season 2004 in which they are needed. GAL III.D, Exhibit 1. DOL determined that the summer season for Martha's Vineyard began on March 15, 2004. Complaint ¶ 18. Plaintiff Daylily Farms, Inc., received DOL certification on January 13, 2004. Plaintiff Joaquin Da Silva received certification on March 16, 2004. Plaintiff Antonio Da Silva received certification on March 24, 2004. Plaintiff The Bagel Authority received DOL certification on April 19, 2004. DeHaan Decl. § 12.

On March 9, 2004, DHS announced that it had received enough H-2B petitions from employers, certified by DOL, to meet the FY 2004 congressionally-mandated cap of 66,000 new temporary foreign workers. See 69 Fed. Reg. 51, 12340-41 (March 16, 2004), March 10, 2004 Press Release, Exhibit 2. DHS announced that it would process all petitions received by March 9, 2004. Id.[10] Although Plaintiffs claim that they filed petitions with DHS for H-2B temporary workers and such petitions were rejected,

---

[10] DHS also announced that certain H-2B workers currently employed in the United States were exempted from the congressionally-mandated 66,000 cap. Id. USCIS has the authority to grant an alien's request for a chance of lawful nonimmigrant status or extension of such status if an alien has already been admitted to the United States. If a prospective H-2B temporary worker is in the United States and is in another lawful nonimmigrant status, the worker may apply to USCIS for a change of status to H-2B. If Employers can also hire H-2B workers currently in the United States who seek an extension of petition validity and extension of their stay, provided he or she has received a labor certification to cover the additional period of employment, seeks a change in the terms of his or her employment, or seeks to change or add employers. Id. See also, 8 C.F.R. § 214.2(h)(6); Bucher Decl.§ 6.

8

Complaint § 15, there is no evidence to support this assertion in the record at this time.[11]

The USCIS processes all petitions and applications in chronological order by date of receipt, pursuant to its Operating Instruction entitled "Chronological Processing of applications and Petitions;" Bucher Decl. ¶ 9, Operating Instructions OI-103.2q; applicable to the processing of all visas, immigrant and non-immigrant, which provides:

> [t]o deal fairly and equitably with applicants and petitioners, it is Service policy that cases be processed in chronological order by date of receipt ... an exception may be permitted ... upon a showing of emergent circumstances.

Processing on a first come, first served basis is required not only by agency formal Operating Instructions, but also, in the case of immigrant visas, by statute. 8 U.S.C. § 1153(e) ("in the order in which the petition on behalf of each immigrant is filed with ... [USCIS]"). The Operating Instruction has been in effect since at least 1990.

## ARGUMENT

I. THE DEFENDANTS' DETERMINATION THAT THE STATUTORY CAP OF 66,000 WORKERS HAS BEEN MET IS NEITHER ARBITRARY, CAPRICIOUS, NOR CONTRARY TO LAW

To the extent that Plaintiffs challenge the Defendants' administration of the statutory cap of 66,000 new temporary foreign workers, their claim is without merit.

---

[11] Defendants reserve the right to contest this claim at a later stage in these proceedings. Moreover, as to Plaintiff Daylily, Inc., Defendants will contend that there was no harm from the imposition of the cap because Daylily received DOL certification of its request for foreign labor on January 12, 2004, well before the March 9, 2004, cutoff and with plentiful opportunity to petition USCIV for visas for its foreign workers.

Judicial deference to the political branches of the government over immigration matters is well settled. See, e.g., INS v. Aguirre-Aguirre, 526 U.S. 415, 424-25 (1999) (judicial deference to the Executive Branch is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations); Reno v. Flores, 507 U.S. 292, 305 (1993) (for reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government) (quoting Mathews v. Diaz, 426 U.S. 67, 81 (1976)). Indeed, the Supreme Court has declared that on no conceivable subject is the legislative power of Congress more complete. Fiallo v. Bell, 430 U.S. 787, 792 (1977), quoting Oceanic Navigation Co. v. Stranahan, 214 U.S. 320, 339 (1909).

As the Supreme Court observed in Chevron U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984):

> The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress. If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the

10

administrator of an agency.

467 U.S. at 843. In Chevron, the Supreme Court confirmed the obligation of the courts to defer to an agency's construction of a statute regardless of whether that construction is the only permissible one, or even the one the reviewing court would have reached independently. Id. at 843 n. 11. If the statute does not directly address the precise question at issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. Id. at 843. If so, the court is obligated to defer to the agency construction. Such is the case here.

Agency interpretations need not be the best possible interpretations, and the court should not overturn a decision "simply because it may prefer another interpretation of the statute." Elatos Restaurant Corp., 632 F.Supp. 1049, at 1053 (S.D.N.Y. 1986), quoting INS v. Jong Ha Wang, 450 U.S. 139, 144 (1981). "Thus courts have refused to overrule agency interpretations of statutory authority in the area of immigration absent an affirmative showing that the interpretation is unreasonable or contrary to legislative intent." Yuk-Ling Wu Jew v. Attorney General, 524 F. Supp.1258, 1260 (D. D.C. 1981). The agency action will stand if the record reveals a rational basis for the decision. Oddo v. Reno, 17 F.Supp.2d 529 (E.D.Va. 1998), aff'd 175 F.3d 1015 (4th Cir. 1999) (Table) (INS did not act arbitrarily or capriciously in revoking petition).

DHS' Operations Instruction OI 103.2q requiring the processing of petitions chronologically by date of receipt is a reasonable implementation of Congress' purpose in

11

regulating admission of foreign workers, where Congress recommended directly that, "[t]hese visas shall be issued on a first come, first served, basis." H. Rep. No. 101-723(I), 101st Con., 2nd Sess., 1990, 1990 USCCAN 6710, 6726. And Congress directed that "[t]here shall be no quarterly or other type of allocation." Id. Moreover, Congress recommended centralized processing of petitions so that the program could be operated consistently nationwide. And, to ensure that the goal of limiting admissions of "H" foreign workers was met, Congress suggested that the agency engage in "continuous monitoring of all admissions." House Rep. No. 101-955, id. at 6791 (Conference Report).

USCIS has processed all petitions and applications, with limited exceptions, by chronological order of receipt since 1990, when the Operating Instruction became effective. Bucher Decl. § 9.[12] The first come, first served procedure applies to all types of applications and petitions, and was applied to H2-B petitions for FY 2004.

USCIS determined that in FY 2004 it had sufficient petitions to meet the Congressionally mandated 66,000 cap for new H-2B workers for FY 2004. Id. Many of the earlier petitions were filed before the 120 days preceding the 2004 summer season (November 15, 2004), because the employers needed H-2B workers before the summer season began. Thus, many of the H-2B applications for DOL certification submitted

---

[12] The Operating Instruction permits exceptions in limited circumstances "upon a showing of emergent circumstances." GAL III.D, Exhibit 1, and O.I., Exhibit 3.

12

before the cap was reached requested H-2B workers earlier in the fiscal year, such as for the winter holiday business, and those applications were permitted to be filed as early as June 15, 2003, 120 days before the start of the winter season on October 15, 2003.

USCIS has been responsible for monitoring the H-2B program and the cap since Congress first imposed a cap with the Immigration and Nationality Act of 1990 (IMMACT '90), Pub. L. 101-649, 104 Stat. 4978, 101st Cong., 2nd Sess., § 205(a), (November 29, 1990). The cap applies to all U.S. employers across the country seeking H-2B temporary workers in any given fiscal year, regardless of seasonal or regional needs. Prior to FY '03, although there had been a gradual increase overall in the number of employers seeking "H" nonimmigrant temporary labor, the H-2B cap was never reached – mainly because U.S. employers initially underutilized the H-2B program. Bucher Decl. ¶ 7. As the result of a review of the H-2B program at the end of FY 2003, USCIS determined that closer monitoring of the program was needed and began exercising stricter controls, closing monitoring the annual cap. Bucher Decl. ¶ 7.

USCIS has accomplished the goal of processing petitions and applications in a chronological, first in first out basis. Bucher Decl. § 10. Given Congress' clear directive on how the section "H" temporary worker programs should be administered, USCIS regards an alternative system, such as allocation by season or by regional location, as contrary to congressional intent. Bucher Decl. § 11.

Moreover, USCIS concludes that creating an allocation system tied to the location

of the employer in the United States or an assigned priority number rather than the expressed need of the employer as determined by a recent test of the labor market and the employer's unique labor requirements at a certain time, would be speculative, problematic and administratively burdensome. Bucher Decl. § 11-12. An alternative allotment system would require extensive coordination with DOL and DOS, and would necessitate extensive data collection and statistical analysis by all three agencies to address issues such as: (a) the number of employers who potentially may need H-2B temporary workers at any particular time during the fiscal year; (b) prioritization of employer needs, particularly for peak seasonal employment during the winter, spring and summer months; and (c) allocation of the numbers issued in a given fiscal year (e.g. whether it is feasible or even legally permissible to allocate on a quarterly, monthly, bimonthly basis, etc.). Bucher Decl. § 12. Alternative systems would be very complicated to carry out and subject the agency to criticisms of arbitrariness. In short, simplicity in carrying out the statutory scheme is an important consideration in evaluating the procedures adopted by the agency. Here, chronological order makes sense because of its certainty and its simplicity, its consistency with the intent of Congress, and its certainty, such that endless data collection, constant deliberation, and possibly frequent litigation would not follow the approval or disapproval of petitions. USCIS' Operating Instructions, like formal agency regulations, are entitled to "great deference," and are to be upheld as reasonable and not inconsistent with the statute; North American Industries,

Inc. v. Feldman, 722 F.2d 893, 898 (1st Cir. 1983).

USCIS, after all, has applied its longstanding policy of chronological processing in a similar and equitable fashion to all petitioners. Though there are limited exceptions to the DHS policy of chronological process (i.e., emergent circumstances), the exceptions are not designed to penalize or affect the ability of those who requested a benefit earlier in the process to ultimately receive the relief requested. Nor have Plaintiffs articulated any reasons that would establish why the need of summer season employers is any reater than that of employers who require H-2B temporary labor earlier in the fiscal year, such as to justify the extraordinary step of processing or applications out of order to provide Plaintiffs with H-2B labor.

To the extent Plaintiffs challenge the DOL's determination that an employer must file a labor certification application no more than 120 days from the date the worker is needed by the employer, the Plaintiffs' challenge is without merit. Under the statute, DOL has the duty to determine that domestic workers are unavailable to perform the temporary services that applicants seek to fill with temporary foreign workers. 8 U.S.C. § 1101(a)(15)(H)(ii)(b), 8 U.S.C. § 1184(c). The DOL has determined that the point in time is 120 days before the employers need the labor. 8 C.F.R. § 214.2(h)(6)(iii); see DeHaan Decl. § 5. This determination is set forth in a formal guideline document, GAL 01-95. 60 Fed. Reg. 7216, 7217 (1995). The 120 day requirement reflects DOL's experience that an adequate test of the domestic labor market for temporary positions

cannot occur more than 120 days (four months) in advance of the date of need and that DOL would not be able to meet its responsibility to determine domestic worker availability any earlier. DeHaan decl. §§ 10-11. Determination of the labor market is, of course, within DOL's expertise, and its internal guideline regarding the applicable time period appropriate for assessing domestic worker availability is entitled to respect as a permissible implementation of the statute. See Reno v. Koray, 515 U.S. 50, 59 (1995).

## II. THERE IS NO BASIS FOR PLAINTIFFS' CLAIM OF A CONSTITUTIONAL VIOLATION

Plaintiffs complain that the Constitution has been violated by the Defendant because Plaintiffs have failed to receive benefits that earlier-applying employers were able to receive. The holding of the Court of Appeals for the First Circuit in Elton Orchards, Inc. v. Brennan, 508 F.2d 493, 498 (1st Cir. 1974) is instructive with respect to the baseless nature of Plaintiffs' claims. In that case, plaintiff requested DOL certification to hire temporary foreign agricultural workers, who were very experienced, to harvest apples. DOL denied permission on the grounds that domestic workers were available. Plaintiff argued that it was entitled to the certification because it had traditionally been certified to hire apple pickers from the West Indies and because other growers had been granted certifications to import foreign workers. The Court of Appeals held that DOL's

> [D]ifferential treatment of growers neither implicates a fundamental right, nor creates a suspect classification. Our inquiry need go only far enough to determine that there existed a rational basis for appellants' actions.

508 F.2d at 498. The Court went on to state,

> It may be that a system which apportioned domestic workers among the various employers submitting clearance orders would afford greater fairness to the employers, but as long as there is a rational basis for the operation of the system in its present form, inequitable or wasteful results argue for pragmatic reforms rather than adjudications of unconstitutionality. We can conceive of rational bases for the separate treatment of the clearance orders of individual employers. It may be simpler for the Department of Labor and the state employment services to handle separate orders, and more efficient to arrange for the transportation of a group of workers to a particular orchard on a particular date. Further, the present manner of operating the ICS may be the most consistent with the desire to protect domestic workers, which underlies all of the statutory provisions here at issue.

Id. Accordingly, the fact that Plaintiffs in this case were treated differently than employers who applied earlier for admission of foreign workers, is no basis for Plaintiffs' claim that Defendants conduct was unconstitutional. Id. As the Court observed, "[i]t is idle to assert at this time in our history that because it results in unequal benefits to different persons, a federal statute which is rationally based is unconstitutional." Id.

There is no constitutional infirmity to the Defendants' administration of the H-2B program merely because latecomers miss benefits that earlycomers receive. Sec'y of Agriculture v. Central Roig Refining Co., 338 U.S. 604, 612 (1950). In Central Roig, the Supreme Court held that the choice among plans for allotment of sugar among refiners, which the Secretary of Agriculture made based on his choice of a representative base

17

period, was constitutional. Id. The Court noted that many factors could have been used by policymakers at the Department of Agriculture to fix sugar quotas and that the ultimate choice was highly complicated. "The Act may impose hardships here and there; the incidence of hardship may shift in location and intensity. It is not for us to have views on the merits of this legislation." Id. at 619. The allotment of statutory benefits was for the Secretary to make, provided that the choice had a rational relation to the statutory goals. Id. at 612. The Court held that the Due Process clause of the U.S. Constitution was not called into play by discrimination experienced by some sectors of the market as a result of the Secretary's allotments. Id.[13] After all, treating different groups differently is constitutionally inoffensive, unless wholly irrelevant to achievement of the objective of the statute. McGowan v. State of Maryland, 366 U.S. 420, 1104 (1961).

There can be no doubt that the 66,000 statutory limit on H-2B foreign workers is rational. The purpose of the statute imposing numerical caps on admission of temporary foreign workers is to protect domestic workers who may be deprived of jobs. Id. at 498. The policy permeates the immigration statutes, that "domestic workers rather than aliens be employed wherever possible." Id. at 499. Congress first imposed caps with the Immigration and Nationality Act of 1990, Pub. L. 101-649, 101st Cong., 2nd Sess. § 205(a), including the 66,000 cap per fiscal year on H-2B temporary workers. Congress

---

[13] The Court noted that the agency's lawful decisions regarding sugar allotment could result in hardship by location or by latecomers versus early comers.

determined, in passing the amendments to the INS, that while "[t]he availability of certain categories of nonimmigrant visas has enhanced trade and accommodated useful movement of people and products . . . other categories . . . have been abused. House Rep. No. 101-723(I), 101st Con., 2d Sess. (1990), 1990 USCCAN 6710, 6746-47. Numerical limitations were established for "three categories of temporary aliens: Entertainers and athletes-9,000; specialty occupations-25,000, and nonagricultural temporary workers-66,000. . . . Unwarranted administrative expansion of the statutory terms in those admissions" needed to be controlled. Id. Congress choose specific quotas as a way to control the administrative tendency to expand the number of temporary workers admitted. House Report No. 101-955, 101st Cong., 2nd Sess., 1990, 1990 USCCAN 6784, 6790-91 (Conference Report). The imposition of a numerical cap is thus rationally related to the goal of protecting domestic labor.

Defendants' administration of 8 U.S.C. § 1101(a)(15)(H)(ii)(b) is consistent with congressional intent that "[t]hese visas shall be issued on a first come, first served, basis," H. Rep. No. 101-723(I), 101st Cong., 2nd Sess. (1990), 1990 USCCAN 6710, 6726, and is rationally related to the legislative goal that the limit be administered in straight-forward fashion without the need for complex formulas and resource-intensive fact-finding. No more is needed to pass constitutional muster.

## CONCLUSION

For the foregoing reasons, Plaintiffs' request for immediate injunctive relief should be denied because Plaintiffs cannot demonstrate any likelihood whatsoever that they will prevail in their contentions that Defendants acted in violation of law.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

_____
ANITA JOHNSON
Assistant U.S. Attorney
Suite 9200
Moakley United States Courthouse
One Courthouse Way
Boston, Mass. 02210
617-748-3266

### Certification of Service

I hereby certify that I have served the foregoing upon Alan Feiner, counsel for Plaintiffs, by first class mail, postage prepaid, on this 7th day of June 2004.

_____