FILED
CLERKS OFFICE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

2004 JUN -8 ₽ 12: 43

CIVIL NO. 04-10838-GAO

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| MICHAEL J. DWYER,<br>Plaintiff | )<br>)<br>) |
| VS. | ) PLAINTIFF'S<br>) OPPOSITION TO DEFENDANT'S<br>) MOTION TO DISMISS |
| COUNTY OF SUFFOLK,<br>Defendant | )<br>)<br>) |

Now comes the plaintiff and opposes the defendant's motion to dismiss for the following reasons:

## I. THE DEFENDANT'S Fed RCivP RULE 12(b)(6) MOTION TO DISMISS SHOULD BE DENIED

## A. THE DEFENDANT'S FedRCivP RULE 12(b)(6) MOTION TO DISMISS COUNT I (ALLEGING NEGLIGENCE PURSUANT TO MGL C.258, S.1 ET SEQ.) SHOULD BE DENIED

The law is well-settled that a motion to dismiss a complaint pursuant to FedRCivP Rule 12(b)(6) for failure to state a cause of action should be denied unless it appears beyond doubt that a plaintiff can prove no set of facts that would entitle him to relief. Nader v. Citorn, 372Mass. 96,97(1977); Conley v.Gibson, 355 U.S. 41,45-46 (1957). In deciding a motion to dismiss, the Court must accept all of the plaintiff's complaint's factual allegations as being true. United States v. Gaubert, 499 U.S. 315,327 (1991).

The plaintiff's complaint avers that while an inmate in the care and custody of the defendant, he was assigned to the upper bunk-bed

1

in his cell, and was injured while attempting to descend from the bunk-bed. The complaint alleges that the defendant was negligent in 1) failing to provide the plaintiff with a ladder or other safe means to descend from...said bed; and 2) in failing to instruct the plaintiff in a safe manner of descending from...said bed. Plaintiff's complaint, paragraph 7.

The defendant's memorandum in support of its motion correctly states the two-pronged analysis set forth by the Massachusetts Supreme Judicial Court (SJC) in <u>Harry Stoller & Co. v. Lowell</u>, 412 Mass. 139(1992) as being the analysis to determine if allegedly negligent conduct by a municipality is immunized as a discretionary function pursuant to MGL. C.258 S.10(b), to wit: first, whether the government actor had any discretion at all as to what course of conduct to follow; and if so; second, whether the discretion exercised rises to the level of policy-making or planning.

With regard to the failure to provide a ladder or other safe means to descend from the bunk-bed, the plaintiff should be allowed to undertake discovery of the defendant in order to flesh out facts bearing on the issue of whether the alleged negligent conduct involved the exercise of discretion which rises to the level of policy-making or planning.

With regard to the allegation of negligence in failing to instruct the plaintiff on the safe means or manner of descending from the upper bunk-bed, it clearly does not appear beyond doubt

2

that such negligent conduct involved the exercise of discretion which rises to the level of policy-making or planning. In fact, the defendant in its memorandum of law in support of its motion does not argue to the contrary. [1]

In <u>Alter v. City of Newton</u>, 35 Mass.App.Ct. 142 (1993), the Massachusetts Appeals Court held that a failure to warn (which is somewhat analogous to a failure to instruct) was not an immunized discretionary function. The court states at p.147:

"The alleged negligence by the city in failing to warn of the danger does not, however, come within the exception of S.10(b).There was no 'obvious planning or policy basis' for that failure. (Cite), nor has the city presented anything to suggest that the failure 'was an integral part of governmental policymaking or planning', or any other considerations discussed in <u>Stoller</u>...It is difficult to imagine the city justifying a decision not to place warning signs to high school students on economic or other policy grounds. In the absence of evidence that the city made such a decision based on policy, it may not here invoke the exception of S.10(b)...Other Federal cases also hold that in the absence of a showing that a failure to warn is a policy decision or that such a policy is obvious, the discretionary function exception does not apply.".

As there is no "obvious planning or policy basis" for a failure of a penal institution to instruct an inmate in a safe manner to descend from a bunk-bed which lacks a ladder, it clearly does not appear beyond doubt that such negligent conduct involved the

---

[1] The defendnsat in a footnote claims that it owed no duty to instruct th eplainitff "in so obvious an endeavor as the exercise of caution in descending from..a top bunk" ;<u>fn 3</u>; and cites caselaw for the proposition that a defendant owes no duty to warn of open and obvious dangers. However, the plaintiff's present complaint does not allege a negligent failure to warn of the danger posed by descending from the ladder-less bunk-bed, but rather alleges that the defendant was negligent in failing to instruct the plaintiff in a safe manner of descending from such bunk-bed. "One who is required by law to take or voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a duty to protect the other against unreasonable risk of physical harm...".<u>Slaven v. Salem,</u> 386 Mass. 885 (1982).

exercise of discretion which rises to the level of policy-making or planning.

## B. THE DEFENDANT'S FedRCivP RULE 12(b)(6) MOTION TO DISMISS COUNT II (ALLEGING A DEPRIVATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS PURSUANT TO 42 USC. S.1983 SHOULD BE DENIED

In count II, the plaintiff alleges that the defendant was aware prior to the date of plaintiff's incident that other inmates in its custody had been injured by falling while ascending to and/or descending from its bunk-beds (complaint, para 12); (via incorporation by reference to said paragraph 7) that the defendant failed to provide the plaintiff with a ladder or other safe means to descend from...said bed; and failed to instruct the plaintiff in a safe manner of descending from ...said bed; (via incorporation by reference to paragraphs 9 and 10) that the plaintiff fell and was injured while attempting to descend from the bunk-bed; and that the defendant maintained policies or customs of deliberate indifference to his Constitutional rights (Id., para. 14).

In the recent case of Educadores Puertorriquenos v. Hernandez, 367 F.3d 61 (1st cir.2004), the Court of Appeals for the first circuit made clear that , based upon recent U.S. Supreme Court precedent (Swierkiewicz v. Sorema, N.A, 543 U.S. 506 (2002)), there exists no heightened pleading requirements for civil rights cases (including those brought pursuant to 42 U.S.C. S. 1983), and that the Fed.RCiv.P Rule 8(a) notice pleading is all that is required of a plaintiff. The Court stated at p.66:

4

"...[c]ourts faced with the task of adjudicating motions to
dismiss under Rule 12(b)(6) must apply the notice pleading
requirements of Rule 8(a)(2). Under that rule, a complaint need
only include 'a short and plain statement of the claim showing that
the pleader is entitled to relief'. This statement must 'give the
defendant fair notice of what the plaintiff's claim is and the
grounds upon which it rests.' (Cite).State of mind, including
motive and intent, may be averred generally.".

The law is well-settled that a prison official's deliberate

indifference to as substantial risk of serious harm to an inmate

violates the Eighth Amendment prohibition against cruel and unusual

punishments, made applicable to the states by the Fourteenth

Amendment. Helling v. McKinney, 509 U.S.  25 (1993); Wilson v.

Seiter, 501 U.S. 294 (1991); Estelle v. Gamble, 429 U.S. 97 (1976).

A pre-trial detainee (like the plaintiff), as opposed to a convict

serving a sentence of incarceration, is entitled to the same

protections as are convicted inmates pursuant to the due process

clause (substantive due process) of the Fourteenth Amendment to the

United States Constitution, which rights are analogous to convicted

inmates' rights pursuant to the Eighth Amendment. Miga v. Hoyoke,

398 Mass. 343, 350 (1986).

A municipal corporation is a "person" within the meaning of 42

U.S.C. S.1983, and is therefore liable where a Constitutional

deprivation occurs pursuant to official municipal policy or a

governmental custom. Monell v. Department of Social Services of the

City of New York, 436 U.S. 658 (1978).

In Farmer v. Brennan, 511 U.S. 825 (1994), the U.S. Supreme

Court defined "deliberate indifference" for the purposes of an

5

Eighth Amendment conditions of confinement case as requiring a showing that prison official(s) had subjective knowledge of an excessive risk of inmate health or safety (i.e. official(s) must be aware of facts from which the inference could be drawn that a substantial risk of harm exists; and must also in fact draw that inference); and the official must disregard such risk. Id.,p.837. Otherwise stated, the official must consciously disregard a substantial risk of serious harm. Id.,p.839. The plaintiff need not show that a prison official acted or failed to act believing that harm would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm. Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence..., and a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. Id.,p.842.

In the instant complaint the plaintiff has alleged the defendant was aware as of January 17, 2003 that inmates had been injured by falling while attempting to ascend and/or descend the bunk-bed 2; yet the defendant maintained a policy or custom of not providing inmates with a ladder or other safe means to ascend the bunk-bed

_____

2 Plaintiff's counsel represents two (2)other inmates who were injured while ascending or descending the upper bunk-bed in their cell prior to the date of the plaintiff's incident in this case. An assented to motion to consolidate all said cases has been filed with the Court.

and/or of not instructing inmates on a safe method to ascend the bunk-bed, as a result of which the plaintiff was injured.

Defendant in its memorandum of law cites an unpublished 7th circuit opinion, Aultman v. Peters, 19 F.3d 21 (7th cir.1994), for support of its proposition that plaintiff's complaint does not make out an Eighth Amendment violation. The plaintiff in Aultman was injured when an inmate sleeping on the bunk-bed above him fell out of the bed and landed on the plaintiff. The Court of Appeals credited the District Court's finding that "the arrangement of the beds did not pose such serious risks that the defendant's knowledge of any impending danger could be inferred". Id.. In the instant case, plaintiff has alleged that prior similar incidents occurred which made the defendant aware of the risk of such incidents as befell the plaintiff.

Here, plaintiff's complaint alleges sufficient facts that the defendant actually knew of the high risk of injuries to inmates caused by the conditions of the bunk-beds, and yet maintained a policy or custom  not to rectify such conditions, thus causing injury to the plaintiff.

Accordingly, the motion to dismiss count II should be denied. 3

---

3 The defendant asserts in its memorandum that it cannot be held liable pursuant to 42 USC S.1983 for failing to supply a ladder, if in fact such failure is a discretionary function pursuant to MGL C.258 S.10(b), (and thus immunizes the defendant from a claim of negligence for that specific conduct). The fact that municipalities may be held liable pursuant to 42 U.S.C. S.1983 for maintaining policies  regarding the training, supervision, review and discipline of employees (such as in City of Oklahoma City v. Tuttle, 471 U.S. 808 (1985) (which entail high level policy and planning decisions) where a municipal defendant is adjudged to be deliberately indifferent (as opposed to merely negligent) in the maintenance of such policies, flies in the face of such assertion.

By his attorney ,

ROBERT H. TOBIN, JR.
TOBIN AND TOBIN, P.C.
735 South Street
Roslindale, MA 02131
Tel. (617) 325-1010
BBO NO. 499425

Dated: _6/7/04_

CERTIFICATE OF SERVICE

I hereby certify that on this day a true copy of the above
document was served upon the attorney of record for each
party by mail/by hand/by fax.
Date: _6/7/04_

8

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2004 JUN -8  A 10: 22

U.S. DISTRICT COURT
DISTRICT OF MASS.

```
                                    )
JASON CLEMENTS                      )
      Petitioner,                   )
                                    )
v.                                  )          Civil Action No. 03-10377-GAO
                                    )
MICHAEL MALONEY                     )
      Respondent.                   )
                                    )
                                    )
```

## ASSENTED-TO MOTION TO EXTEND TIME TO OPPOSE RESPONDENT'S MOTION TO DISMISS THE PETITION FOR WRIT OF HABEAS CORPUS

The petitioner, by and through counsel, Attorney Rosemary Curran Scapicchio, hereby requests that the Court extend the time within which he must respond to the respondent's motion to dismiss the petition for writ of habeas corpus. By this motion, the petitioner requests up to and including June 25, 2004, to file an opposition brief to the respondent's motion to dismiss the petition for writ of habeas corpus. The respondent's counsel, Susan G. Reardon, Assistant Attorney General, has assented to the requested extension. As grounds for the motion, the petitioner states as follows:

1. The undersigned counsel is currently in the middle of Motions to Suppress and Dismiss in a Suffolk County murder case Commonwealth v. James Bush, (Spurlock, J.). The Motions are expected to be followed by an immediate trial. The Commonwealth currently has 148 witnesses on their list for trial. As such, counsel expects the trial in Bush case to conclude by June 22, 2004.

2. Pursuant to L.R. 7.1(A)(2), the undersigned counsel conferred with the respondent's counsel, who agreed to the extension of time.

WHEREFORE, counsel requests that this Court allow her Motion to Extend Time up to and including June 25, 2004, to oppose respondent's motion to dismiss the writ of habeas corpus.

Respectfully Submitted,
JASON CLEMENTS
By His Attorney

Rosemary Curran Scapicchio
Four Longfellow Place
Suite 3703
Boston, Massachusetts 02114
(617) 263-7400
BBO # 558312

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each party and upon any party appearing pro se by first class mail, postage prepaid or by hand delivery.

Dated:_____    _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2004 JUN -8  P 3: 59

U.S. DISTRICT COURT
DISTRICT OF MASS.

|  |  |  |
|---|---|---|
| DAYLILY FARMS, INC., *et al* | ) | |
| | ) | CIVIL ACTION |
| Plaintiffs, | ) | NO. 04-11002-GAO |
| | ) | |
| v. | ) | |
| | ) | |
| ELAINE L. CHAO, United States | ) | |
| Department of Labor, *et al,* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MOTION TO SUBSTITUTE ORIGINAL DECLARATION

Defendant filed a facsimile copy of the Declaration of Steven P. Bucher with its

memorandum filed in this action on June 7, 2004.   Defendant now requests leave of the

Court to file the original of the Declaration.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

ANITA JOHNSON
Assistant U.S. Attorney
Suite 9200
Moakley United States Courthouse
One Courthouse Way
Boston, Mass. 02210
617-748-3266

## Certification of Service

I hereby certify that I have served the foregoing upon Alan Feiner, counsel for Plaintiffs, by first class mail, postage prepaid, on this 8th day of June 2004.

## DECLARATION OF STEVEN P. BUCHER

I, Steven P. Bucher, declare as follows:

　　　1.　　　I am employed as a Deputy Director, Service Center Operations, U.S. Citizenship and

Immigration Services (USCIS), Department of Homeland Security (hereinafter "Department" or

"DHS"), Washington, D.C.  I have been employed in the above position with DHS (formerly the

Immigration and Naturalization Service) since 2000 and previously have held various positions in

the regional offices and at Headquarters.

　　　2.　　　The H-2B program is designed to match U.S. employers in need of temporary

labor or services with temporary foreign labor.  An H-2B alien is described in section

101(a)(15)(h)(ii)(b) of the Immigration and Nationality Act (Act) as an alien coming temporarily

to the United States to perform temporary nonagricultural labor or services. This definition also

is reflected in DHS regulations at 8 CFR 214.2(h)(1)(ii)(D) and (h)(6)(i).

　　　3.　　　The H-2B issuance process is spread across three U.S. government agencies - the

Departments of Labor, Homeland Security, and State.  Prospective employers seeking H-2B

workers must first apply to the Department of Labor (DOL) for a temporary labor certification.

DOL determines whether the prospective employer has established that hiring the prospective H-

2B worker will not displace any qualified U.S. workers or adversely affect the wages and

working conditions of such workers.  Once DOL approves a temporary labor certification, the

prospective employer may file with the USCIS a petition, Form I-129, Petition for Nonimmigrant

Worker, to classify the prospective worker as an H-2B temporary worker.

　　　4.　　　Under DHS regulations, a U.S. employer seeking an H-2B temporary worker may

not file a Form I-129 without the required labor certification or a non-determination letter from

1

DOL. See 8 CFR 214.2(h)(6)(iii)(C) and (E) and (iv)(A) and (D). The USCIS determines whether the prospective employer has demonstrated that its need for the services or labor of the prospective worker is temporary. "Temporary" is defined as a one-time occurrence, peak load need, seasonal need (e.g. the winter holiday shopping rush from Thanksgiving to Christmas or short-term recreational seasons such as the ski season or spring breaks), or intermittent need and generally the need for such labor does not exceed a one-year period. Once USCIS approves the petition, prospective workers may receive an H-2B visa or be accorded H-2B nonimmigrant status, depending on where the worker is located.

5.     DHS does not have authority to issue H-2B visas. That authority rests solely with the Department of State (DOS). If a prospective H-2B temporary worker is outside the United States, the alien may apply for an H-2B visa at the appropriate consulate or embassy. DOS may interview the prospective H-2B worker and, if positively vetted, issue a H-2B visa based on the approved USCIS petition.

6.     DHS generally has the authority to grant an alien's request for a change of lawful nonimmigrant status or extension of such status if an alien has already been admitted to the United States. If a prospective H-2B temporary worker is in the United States in another lawful nonimmigrant status, the alien may apply with the USCIS for a change of status to that of an H-2B temporary worker. If an alien has already been granted H-2B temporary worker status and seeks to work for another employer or with a new employer, the alien may request an extension of petition validity and of extension stay, assuming he or she has received a labor certification to cover the additional period of employment. DHS, Customs and Border Protection (CBP) also may accord H-2B status to a temporary worker at the port of entry for Canadian nationals seeking

2

admission based on an approved USCIS petition.

7.     DHS (and legacy Immigration and Naturalization Service) has been responsible for monitoring the H-2B program and the cap since Congress first imposed a cap with the Immigration and Nationality Act of 1990 (IMMACT '90), Pub. L. 101-649, 104 Stat. 4978, 101st Cong., 2nd Sess., § 205(a), (November 29, 1990). Congress has limited the number of aliens who may be issued visas or otherwise provided H-2B nonimmigrant status during any fiscal year to 66,000. 8 USC 1184(g)(1). This cap applies to all U.S. employers across the country seeking H-2B temporary workers in any given fiscal year, regardless of seasonal or regional needs. Prior to FY'03, though there had been a gradual increase overall in the number of employers seeking H nonimmigrant temporary labor, the H-2B cap was never reached – mainly because U.S. employers initially underutilized the H-2B program. After a review of the program at the end of FY'03, DHS began exercising stricter controls over the H-2B program and began closer monitoring of the annual cap count for FY '04.

8.     On March 10, 2004, USCIS issued a press release announcing that it had received sufficient petitions to meet FY '04 cap. USCIS also indicated that it would not accept any new H-2B petitions subject to the FY '04 cap except for those cases that are not counted towards the cap. USCIS continued to accept and continues to process H-2B petitions filed to: (1) extend the stay of a current H-2B worker in the United States; (2) change the terms of employment for current H-2B workers; or (3) allow current H-2B workers to change or add employers. For all other cases filed after March 9, 2004, USCIS indicated it would return all petitions subject to the annual cap, along with the filing fee (and if applicable, the premium processing fee). U.S. employers seeking H-2B temporary workers could re-submit or file new petitions after they have received approved temporary

3

labor certifications from DOL for work to commence in FY '05. See Attachment A. USCIS similarly issued a Federal Register notice on March 16, 2004, (69 FR 12340), notifying the public of that USCIS had sufficient petitions to reach the FY'04 cap. See Attachment B.

9.     DHS processes all applications and petitions chronologically, based on the date of receipt, except in limited circumstances. Processing on a "first come, first served" basis is a longstanding agency policy as reflected in current agency Operating Instructions. Our Operating Instruction 103.2(q) entitled *Chronological Processing of Applications and Petitions* provides that "[t]o deal fairly and equitably with applicants and petitioners, it is Service [now DHS] policy that cases be processed in chronological order by the date of receipt." The OI does permit exceptions in limited circumstances "upon a showing of emergent circumstances." To my knowledge, OI 103.2(q) has been in effect since at least 1990 and DHS (legacy Immigration and Naturalization Service) has applied this rule, with limited exception, to the processing of all applications or petitions, including immigrant and nonimmigrant visas.

10.     In the H-2B context, chronological processing is also consistent with Congressional intent for the provision of nonimmigrant visas in the temporary worker programs. When Congress imposed numerical limits on the H temporary worker programs with IMMACT '90, the House report suggested that the agency "centralize processing" to address concerns related to forum shopping and the need for uniformity in adjudication. See H.R. 101-723(I), 101st Cong. 2nd Sess. 67 (1990). Congress also indicated that H nonimmigrant visas "shall be issued on a first come, first served, basis. There shall be no quarterly or other type of allocation." Id. DHS has accomplished these goals through the creation of USCIS Service Centers that, with limited exception, process petitions and applications in a chronological, first in first out basis.

4

11.    The H-2B program was specifically designed to address short-term, temporary needs. To create an allocation system that is tied to the location of the employer in the United States or an assigned priority number rather than the expressed need of the employer as determined by a recent test of the labor market and the employer's unique labor requirements at a particular time of year, in my view, would be speculative and contrary to legislative intent for administration of the H-2B program.    Given Congress's clear directive on how the H nonimmigrant programs should be administered, it would be contrary to this mandate, if DHS, DOL, and DOS were to create an alternative H-2B visa or status allocation process, either through assigning priority numbers to U.S. employers seeking temporary labor during a particular season or through regional allocation.

12.    Even if these alternatives were consistent with Congressional intent, in my view, creating such a process would be problematic and administratively burdensome, require extensive coordination with DOL and DOS, and require extensive data collection and statistical analysis by all three agencies to address issues such as: (a) the number of employers who potentially may need H-2B temporary workers at any particular time during the fiscal year, (b) prioritization of employer needs, particularly for peak seasonal employment during the winter, spring and summer months, and (c) allocation of the numbers issued in a given fiscal year (e.g. whether it is feasible or even legally permissible to allocate on a quarterly, monthly, bimonthly basis, etc.).

13.    Further, any such proposal would need to be reviewed and likely approved through legislative action by Congress, given congressional interest in any changes made to administration of H nonimmigrant programs.  Amendments to the H-2B cap and other statutory language relating to H-2B temporary workers is within the sole province of Congress.  Neither DHS nor the Administration can change the law.  Only Congressional action can change the cap or adjust the other provisions of

5

H-2B law. I am aware that there are several draft legislative proposals currently under consideration by Congress that are designed to address the H-2B program and F Y'04 c ap. I f any o f t hese legislative proposals ultimately is passed by Congress and made law, USCIS will implement the law accordingly.

14.     U.S. employers affected by the announcement of the H-2B cap for FY '04 do have other available alternatives to meet their temporary employment needs. Aside from domestic labor, including U.S. citizens and lawful permanent resident aliens, there are a number of other nonimmigrant categories that authorize aliens to be employed, provided they have been admitted to the United States, currently maintain lawful nonimmigrant status, and have received evidence of employment authorization from USCIS (or are work authorized by USCIS). Finally, as indicated above, USCIS continues to process petitions for those aliens who are currently in H-2B status and seek an extension of such status to assume concurrent or new employment. Such H-2B aliens are authorized to continue work in the United States.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___7 th___ day of June 2004.

Steven P. Bucher
Deputy Director
Service Center Operations
DHS, U.S. Citizenship and Immigration Services

6