UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DAYLILY FARMS, INC., *et al*        )
                                    )
        Plaintiffs,                 )    CIVIL ACTION
                                    )    NO. 04-11002-GAO
                                    )
        v.                          )
                                    )
ELAINE L. CHAO, United States       )
Department of Labor, *et al,*       )
                                    )
        Defendants.                 )
                                    )

**DEFENDANT UNITED STATES' MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS COMPLAINT**

INTRODUCTION

The Complaint in this action seeks a declaratory judgment that Defendant United

States was in violation of law in administering the "H-2B" temporary foreign workers

visa program, and seeks permanent and preliminary relief in order to employ H-2B

workers for the FY 2004 summer season. This Court denied preliminary relief, June 9,

2004. Plaintiffs, who are owners of businesses on Martha's Vineyard, Massachusetts,

obtained certifications from the U.S. Department of Labor ("DOL") that hiring foreign

temporary workers would not displace any qualified U.S. workers or adversely affect the

wages and working conditions of domestic workers. However, on March 9, 2004, the

Department of Homeland Security ("DHS"), U.S. Citizenship and Immigration Services

("USCIS") announced that it would no longer accept employers' petitions for H-2B

temporary worker visas because the statutory cap of 66,000 temporary foreign workers for FY 2004 had been met. Accordingly, Plaintiffs were eligible to hire new H-2B temporary foreign workers but unable to secure immigration clearance for the workers.[1]

Plaintiffs contend that the application of the statutory cap to their request for H-2B workers is inequitable and unconstitutional. However, as shown below, Defendant's conduct was in accordance with all applicable statutes, regulations, as well as formal agency guidelines and procedures. Plaintiffs cannot show that any pertinent statute is unconstitutional, and they cannot show that Defendant's regulations and formal guidelines and procedures are arbitrary and capricious or irrational. Indeed, Plaintiffs point to the inequitable result of Defendant's use of the applicable law, regulations, and policies -- which allotted a large proportion of the 66,000 H2-B worker visas for FY 2004 to employers who needed them earlier in the year – rather than point to particular, unconstitutional or otherwise illegal provisions. Defendant's conduct was entirely lawful, no judicial remedy is available to Plaintiffs, and their recourse lies elsewhere. Accordingly, Defendant is entitled to dismissal of the Complaint.[2]

---

[1] The Complaint is moot insofar as it requests relief for Plaintiffs for FY 2004.

[2] For purposes of a motion under Rule 12(b), Federal Rules of Civil Procedure, the "well pled factual averments" of the complaint are to be taken as true. Feliciano v. State of Rhode Island, 160 F.3d 780, 788 (1st Cir. 1998). Consideration of documents such as the Declarations of Delores DeHaan and Steven P. Bucher, does not require a district court to convert a motion to dismiss into one for summary judgment, as such documents are not considered to be "outside the pleadings" under Rule 12(b). See Beddall v. State Street Bank, 137 F.3d 12, 16-17 (1st Cir.

(continued...)

## LEGAL FRAMEWORK

This case arises under the H-2B program, which provides for the admission of temporary nonimmigrant foreign workers to perform nonagricultural or seasonal labor or services.[3]  See Section 101(a)(15)(H)(ii)(b) of the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1101(a)(15) (H)(ii)(b).  Pursuant to the INA, the Secretary of the Department of Homeland Security ("DHS")[4] is authorized, after consultation with appropriate agencies, to grant petitions from employers seeking nonimmigrant aliens who fit into one of several categories specified in 8 U.S.C. § 1184(a),(c)(1), 1101(a)(15).  The "H-2B" category describes a nonimmigrant temporary worker as:

> (ii)  an alien having a residence in a foreign country which he
> has no intention of abandoning who is coming temporarily to

---

[2](...continued)
1998) (taking a "practical commonsense approach" and considering documents without converting motion where allegations of complaint were dependent on documents and authenticity was not challenged); Watterson v. Page, 987 F.2d 1, 3 (1ˢᵗ Cir. 1993)(exceptions to the general rule requiring conversion can be applied "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint"); Fudge v. Penthouse Intern., Ltd., 840 F.2d 1012, 1015 (1ˢᵗ Cir. 1988) (conversion unnecessary where article attached to Rule 12(b)(6) motion was central to Complaint, plaintiffs did not challenge authenticity and plaintiffs suffered no prejudice).

[3]  The H-2A program applies to agricultural foreign workers.

[4]  The Homeland Security Act of 2002, Public Law 107-296, transferred the adjudicatory functions of the Commissioner of the Immigration and Naturalization Service to the Bureau of Citizenship and Immigration Services in the U.S. Department of Homeland Security ("USCIS"). 6 U.S.C. § 271. USCIS processes most immigrant and nonimmigrant benefits provided to foreign nationals admitted to or within the United States.

the United States to perform temporary services or labor, if unemployed persons capable of performing such service or labor cannot be found in this country. . . .

8 U.S.C. § 1101(a)(15)(H)(ii)(b).

The purpose of the "H" temporary worker category for foreign workers, is to give the DHS sufficient authority to admit temporary workers to alleviate labor shortages as they exist or may develop in certain areas or branches, particularly in periods of intensified production. H.R. Rep. No. 1365, 82nd Cong., 2d Sess. (1952), *reprinted in* 1952 U.S. Code Cong.&Ad. News (USCCAN) 1697-98. It was designed to balance the effect of foreign labor on the domestic workforce with the country's need for skilled laborers. Id. at 1697-98, 1705.[5] In 1965, the "H" category in the statute was amended so that alien labor may be admitted only if DOL finds that American labor would not be adversely affected by the entry. Pub. L. No. 89-236 (1965). In that connection, Congress indicated that the purpose of the change was to strengthen the protection of American labor. S. Rep. No. 748, 89th Cong., 1st Sess. (1965) 1965 USCCAN 3328, 3333, as cited

---

[5] In 1986, the H-2 section of the statute was amended to distinguish agricultural workers from nonagricultural workers. See Immigration Reform and Control Act (IRCA), Pub. L. No. 99-603, 100 Stat. 3411, § 301(a). At that time, Congress reiterated, as to agricultural workers, the desire to facilitate the entrance of temporary workers to alleviate the labor shortages and at the same time avoid the abuses of allowing employers to import cheap labor and adversely affect the domestic agricultural workforce. See H.R. 99-682(I), 99th Cong., 2d Sess. (1986), *reprinted in* 1986 USCCAN 5649, 5654-55, 5683-87, and 5701-02. The Department of Justice, speaking in support of the legislation, articulated the need to balance the needs of the U.S. agricultural producers against any rule that would create an incentive for employers to hire foreign workers over domestic laborers. See remarks of Edwin Meese, III, H.R. Rep. No. 99-682(I), 99th Cong., 2d Sess. (1986), *reprinted in 1986* USCCAN 5649, 5710.

in Internat'l Union of Bricklayers and Allied Craftsmen v. Meese, 761 F.2d 798, 804

(D.C. Cir. 1985) (Congress has . . . been concerned with the impact of competition by

foreigners on the American labor force since 1885, and has passed increasingly restrictive

legislation on the entry of nonimmigrant alien workers.). See also, Internat'l

Longshoremen's and Warehousemen's Union v. Meese, 891 F.2d 1374, 1383 (9th Cir.

1989) (citing Congress' purpose of protecting American laborers from an influx of skilled

and unskilled labor).  As noted in Digilab, Inc. v. Sec'y of Labor, 495 F.2d 323 (1st Cir.

1974), 8 U.S.C. §1182(a)(14) has two praiseworthy congressional objectives to be

reconciled: (1) to admit . . . skilled workers from other lands who would make a

contribution to our society, and (2) to protect our own workers by excluding aliens whose

entry might deprive our citizens of comparable jobs.

DOL is required to attempt to reconcile these objectives in its consideration of

whether there are sufficient workers able, willing, and qualified to perform the jobs for

which employers seek temporary foreign workers.  Id.  DOL is required to advise DHS

regarding whether admission of H-2B workers will have an adverse effect on U.S.

workers.  8 U.S.C. § 1101(a)(15)(H)(ii)(B).  See Declaration of Dolores DeHaan,

Employment and Training Administration, DOL, ¶ 3, Attachment to United States'

Opposition to Plaintiffs' Request for Preliminary Relief (hereafter, declarations and

exhibits referred to are those filed with the United States' Opposition, June 7, 2004).

DOL regulations require the would-be employer of H-2B workers to file an

5

application at the local office of the State employment service serving the area of

proposed employment, showing the employer's attempts to recruit domestic workers and

the appropriateness of the wages and working conditions offered.  20 C.F.R. § 655.2.

According to DOL policy, the employer is permitted to file a labor certification

application only within 120 days before the worker is needed by the employer.  This DOL

policy, set forth in General Administrative Letter ("GAL") 01-95, Exhibit 1,[6] has been in

effect since approximately 1984 and is applicable to all applications filed under the H-2B

program.[7]  DeHaan Decl. §§ 9-11.  The prohibition on filing applications for temporary

labor certifications more than 120 days before the workers are needed is necessary

because the availability of temporary workers in the United States changes over short

periods of time and an adequate survey of the labor market cannot be made for a longer

---

[6] GALs are administrative orders by which the Employment and Training Administration of the Department of Labor issues interpretative guidance to its Regional Offices.  GAL 01-95, Procedures for H-2B Temporary Labor Certification in Nonagricultural Occupations, (November 10, 1994), 60 Fed. Reg. 7216 (February 7, 1995).

[7] The GAL provides that [u]nless the Certifying Officer specifies otherwise, the SESA should return to employers requests for temporary labor certification filed more than 120 days before the worker is needed and advise them to refile the application no more than 120 days before the worker is needed.  This is necessary since the availability of temporary U.S. workers changes over short periods of time and an adequate test of the labor market cannot be made for a longer period.  60 Fed. Reg. 7216, 7217. This requirement reflects DOL s program experience that an adequate test of the domestic labor market for a temporary position cannot occur more than four months before date of need and therefore would not permit DOL to meet its responsibility to determine domestic worker availability.  DeHaan Decl. § 10.

period. DeHaan Decl.§ 10.  60 Fed. Reg. 7216, 7217(1995).[8]

When DOL certifies an employer's application for H-2B workers, DOL is "advising" the director of USCIS on whether or not United States workers capable of performing the temporary services or labor are available and whether or not the alien's employment will adversely affect the wages and working conditions of similarly employed United States workers.  8 C.F.R. § 214.2(h)(6)(iii).  See GAL, V.A. Exhibit 1.  The DOL Regional Administrator approves the employer's application for certification "if he or she finds that qualified persons in the United States are not available and that the terms of employment will not adversely affect the wages and working conditions of workers in the United States similarly employed."  20 C.F.R. § 655.3(a).

Once DOL has certified the application, the employer must file a petition for an H-2B nonimmigrant worker visa (Form I-129) with USCIS.  8 C.F.R. § 214.2(h)(6)(iv)(A)(1) & (2).  The USCIS has the responsibility for adjudicating such petitions for H-2B workers and according individual aliens such status.  GAL 01-95, Section I.C. Exhibit 1.[9]  Admission of H-2B workers to the United States is limited by statute to 66,000 per year.  8 U.S.C. § 1184(g)(1)(B).

---

[8] Employers seeking foreign agricultural workers under section H-1B, must wait until 60 days before their need for the workers, and do not have the advantage of a 120 day advance period.

[9] The USCIS is not bound by DOL's certification or notice that certification cannot be made.  8 C.F.R. § 214.2(h)(6)(iv)(A), (D), and (E).  However, USCIS will give deference to DOL's certification in most cases.

## STATEMENT OF FACTS

Plaintiffs each applied to DOL for certification that there were insufficient available domestic workers for the positions they wished to fill for the summer 2004 season and that their employment of temporary foreign workers would not adversely affect the wages and working conditions of domestic workers similarly employed. 8 U.S.C. §1182(a)(14). DeHaan Decl. § 12.[10] DOL determined that the summer season for Martha's Vineyard began on March 15, 2004. Complaint ¶ 18. Plaintiffs' applications were filed after November 15, 2003, within 120 days of the summer season 2004 in which they were needed. GAL III.D, Exhibit 1. Plaintiff Daylily Farms, Inc., received DOL certification on January 13, 2004. DeHaan Decl. § 12. Plaintiff Jerry Weiner received DOL certification on February 2, 2004. Id. Plaintiff Joaquin Da Silva received certification on March 16, 2004. Id. Plaintiff Antonio Da Silva received certification on March 24, 2004. Plaintiff The Bagel Authority received DOL certification on April 19, 2004. Id.

On March 9, 2004, DHS announced that it had received enough H-2B petitions from employers, certified by DOL, to meet the FY 2004 congressionally-mandated cap of 66,000 new temporary foreign workers. See 69 Fed. Reg. 51, 12340-41 (March 16, 2004), March 10, 2004 Press Release, Exhibit 2. DHS announced that it would process

---

[10] The exception is Plaintiff Jerry Wiener, for whom DOL has no record of any petition for H-2B certification. DeHaan Decl. § 13.

all petitions received by March 9, 2004. Id.[11]  Although Plaintiffs claim that they filed

petitions with DHS for H-2B temporary workers and such petitions were rejected,

Complaint § 15, there is no evidence in the record to support this assertion.[12]

The USCIS processes all petitions and applications in chronological order by date

of receipt, pursuant to its Operating Instruction entitled "Chronological Processing of

applications and Petitions;" Bucher Decl. ¶ 9, Operating Instructions OI-103.2q;

applicable to the processing of all visas, immigrant and non-immigrant, which provides:

> [t]o deal fairly and equitably with applicants and petitioners, it
> is Service policy that cases be processed in chronological
> order by date of receipt ... an exception may be permitted . . .
> upon a showing of emergent circumstances.

Processing on a first come, first served basis is required not only by agency formal

Operating Instructions, but also, in the case of immigrant visas, by statute.  8 U.S.C.

---

[11]  DHS also announced that certain H-2B workers currently employed in the United States were exempted from the congressionally-mandated 66,000 cap. Id. USCIS has the authority to grant an alien's request for a chance of lawful nonimmigrant status or extension of such status if an alien has already been admitted to the United States.  If a prospective H-2B temporary worker is in the United States and is in another lawful nonimmigrant status, the worker may apply to USCIS for a change of status to H-2B.  If Employers can also hire H-2B workers currently in the United States who seek an extension of petition validity and extension of their stay, provided he or she has received a labor certification to cover the additional period of employment, seeks a change in the terms of his or her employment, or seeks to change or add employers.  Id.  See also, 8 C.F.R. § 214.2(h)(8); Bucher Decl.§ 6.

[12]  Defendant contends that there was no harm to Plaintiff Daylily from DHS' imposition of the cap on March 9, 2004, because Daylily received DOL certification of its request for foreign labor on January 12, 2004, weeks before the cutoff and with ample time to petition USCIS for visas.  The same is true of Plaintiff Jerry Weiner, who was certified on February 2, 2004.

§ 1153(e) ("in the order in which the petition on behalf of each immigrant is filed with . . . [USCIS]").  The Operating Instruction has been in effect since at least 1990.

## ARGUMENT

I.  DHS' DETERMINATION THAT THE STATUTORY CAP OF 66,000 WORKERS WAS MET WAS NOT ARBITRARY, CAPRICIOUS, OR CONTRARY TO LAW.

To the extent that Plaintiffs challenge the Defendant's administration of the statutory cap of 66,000 new temporary foreign workers, their claim is without merit. Judicial deference to the political branches of the government over immigration matters is well settled.  See, e.g., INS v. Aguirre-Aguirre, 526 U.S. 415, 424-25(1999) (judicial deference to the Executive Branch is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations); Reno v. Flores, 507 U.S. 292, 305 (1993) (for reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government) (quoting Mathews v. Diaz, 426 U.S. 67, 81 (1976)).  Indeed, the Supreme Court has declared that on no conceivable subject is the legislative power of Congress more complete.  Fiallo v. Bell, 430 U.S. 787, 792 (1977), quoting Oceanic Navigation Co. v. Stranahan, 214 U.S. 320, 339 (1909).

As the Supreme Court observed in Chevron U.S.A. v. Natural Resources Defense

Council, Inc., 467 U.S. 837 (1984):

> The power of an administrative agency to administer a
> congressionally created ... program necessarily requires the
> formulation of policy and the making of rules to fill any gap
> left, implicitly or explicitly, by Congress. If Congress has
> explicitly left a gap for the agency to fill, there is an express
> delegation of authority to the agency to elucidate a specific
> provision of the statute by regulation. Such legislative
> regulations are given controlling weight unless they are
> arbitrary, capricious, or manifestly contrary to the statute.
> Sometimes the legislative delegation to an agency on a
> particular question is implicit rather than explicit. In such a
> case, a court may not substitute its own construction of a
> statutory provision for a reasonable interpretation made by the
> administrator of an agency.

467 U.S. at 843. In Chevron, the Supreme Court confirmed the obligation of the courts to

defer to an agency's construction of a statute regardless of whether that construction is the

only permissible one, or even the one the reviewing court would have reached

independently. Id. at 843 n. 11. If the statute does not directly address the precise

question at issue, the question for the court is whether the agency's answer is based on a

permissible construction of the statute. Id. at 843. If so, the court is obligated to defer to

the agency construction. Such is the case here.

Agency interpretations need not be the best possible interpretations, and the court

should not overturn a decision "simply because it may prefer another interpretation of the

statute." Elatos Restaurant Corp., 632 F.Supp. 1049, at 1053 (S.D.N.Y. 1986), quoting

INS v. Jong Ha Wang, 450 U.S. 139, 144 (1981). "Thus courts have refused to overrule

11

agency interpretations of statutory authority in the area of immigration absent an affirmative showing that the interpretation is unreasonable or contrary to legislative intent." <u>Yuk-Ling Wu Jew v. Attorney General</u>, 524 F. Supp.1258, 1260 (D. D.C. 1981). The agency action will stand if the record reveals a rational basis for the decision. <u>Oddo v. Reno</u>, 17 F.Supp.2d 529 (E.D.Va. 1998), <u>aff'd</u> 175 F.3d 1015 (4th Cir. 1999) (Table) (INS did not act arbitrarily or capriciously in revoking petition).

DHS has chosen to process petitions for H-2B visas chronologically by date of receipt. Operations Instruction OI 103.2q. This is a reasonable implementation of Congress' purpose in regulating admission of foreign workers because Congress recommended directly that, "[t]hese visas shall be issued on a first come, first served, basis." H. Rep. No. 101-723(I), 101st Con., 2nd Sess., 1990, 1990 USCCAN 6710, 6726. And Congress directed that "[t]here shall be no quarterly or other type of allocation." <u>Id</u>. Moreover, Congress recommended centralized processing of petitions so that the program could be operated consistently nationwide. And Congress suggested that the agency engage in "continuous monitoring of all admissions" in order to ensure that the goal of limiting admissions of "H" foreign workers was met. House Rep. No. 101-955, <u>id</u>. at 6791 (Conference Report).

USCIS has processed all types of petitions and applications, with limited exceptions, by chronological order of receipt since 1990, when the Operating Instruction

12

became effective. Bucher Decl. § 9.[13]  DHS applied the first come, first served procedure to H2-B petitions for FY 2004. Id.

USCIS determined that in FY 2004 it had sufficient petitions to meet the Congressionally mandated 66,000 cap for new H-2B workers for FY 2004. Id. Many of the earlier petitions were filed before the 120 days preceding the 2004 summer season (November 15, 2004), because employers needed H-2B workers before the summer season began.  Thus, many of the H-2B applications for DOL certification submitted before the cap was reached requested H-2B workers earlier in the fiscal year, such as for the winter holiday business, and those applications were permitted to be filed as early as June 15, 2003, 120 days before the start of the winter season on October 15, 2003.

USCIS has been responsible for monitoring the H-2B program and the cap since Congress first imposed a cap with the Immigration and Nationality Act of 1990 (IMMACT '90), Pub. L. 101-649, 104 Stat. 4978, 101st Cong., 2nd Sess., § 205(a), (November 29, 1990).  The cap applies to all U.S. employers across the country seeking H-2B temporary workers in any given fiscal year, regardless of seasonal or regional needs. Prior to FY'03, although there had been a gradual increase overall in the number of employers seeking "H" nonimmigrant temporary labor, the H-2B cap was never reached – mainly because U.S. employers initially underutilized the H-2B program.

---

[13] The Operating Instruction permits exceptions in limited circumstances "upon a showing of emergent circumstances."  GAL III.D, Exhibit 1, and O.I., Exhibit 3.

13

Bucher Decl. ¶ 7.  As the result of a review of the H-2B program at the end of FY 2003,

USCIS determined that closer monitoring of the program was needed and began

exercising stricter controls, closing monitoring the annual cap.  Bucher Decl. ¶ 7.

USCIS' close monitoring of the number of visas issued in FY 2004, explains, in part, why

Plaintiffs were denied visas this year.  However, USCIS' monitoring and enforcement of

the statutory cap was in compliance with all applicable law.

## II.  USCIS' CHRONOLOGICAL CONSIDERATION OF H-2B VISA APPLICATIONS IS NOT ARBITRARY, CAPRICIOUS, OR CONTRARY TO LAW.

USCIS has accomplished the goal of processing petitions and applications in a

chronological, first in first out basis.  Bucher Decl. § 10.  Given Congress' clear directive

on how the section "H" temporary worker programs should be administered, USCIS

regards an alternative system, such as allocation by season or by regional location, as

contrary to congressional intent.  Bucher Decl. § 11.

Moreover, USCIS concludes that creating an allocation system tied to the location

of the employer in the United States or an assigned priority number rather than the

expressed need of the employer as determined by a recent test of the labor market and the

employer's unique labor requirements at a certain time, would be speculative,

problematic and administratively burdensome.  Bucher Decl. § 11-12.  An alternative

allotment system would require extensive coordination with DOL and DOS, and would

14

necessitate extensive data collection and statistical analysis by all three agencies to address issues such as: (a) the number of employers who potentially may need H-2B temporary workers at any particular time during the fiscal year; (b) prioritization of employer needs, particularly for peak seasonal employment during the winter, spring and summer months; and (c) allocation of the numbers issued in a given fiscal year (e.g. whether it is feasible or even legally permissible to allocate on a quarterly, monthly, bimonthly basis, etc.).  Bucher Decl. § 12.  Alternative systems would be very complicated to carry out and subject the agency to criticisms of arbitrariness.  In short, simplicity in carrying out the statutory scheme is an important consideration in evaluating the procedures adopted by the agency.  Here, chronological order makes sense because of its certainty and its simplicity, its consistency with the intent of Congress, and its certainty, such that endless data collection, constant deliberation, and possibly frequent litigation would not follow the approval or disapproval of petitions.  USCIS' Operating Instructions, like the agency's formal regulations, are entitled to "great deference," and are to be upheld as reasonable and not inconsistent with the statute; North American Industries, Inc. v. Feldman, 722 F.2d 893, 898 (1st Cir. 1983).

USCIS, after all, has applied its longstanding policy of chronological processing in a similar and equitable fashion to all petitioners.  Though there are limited exceptions to the DHS policy of chronological process (i.e., emergent circumstances), the exceptions are not designed to penalize or affect the ability of those who requested a benefit earlier in

15

the process from ultimately receiving the relief requested.   Nor have Plaintiffs articulated

any   reasons that would establish why the need of summer season employers is any

greater than that of employers who require H-2B temporary labor earlier in the fiscal

year, such as to justify the extraordinary step of processing or applications out of order to

provide Plaintiffs with H-2B labor.

### III.  DOL'S DETERMINATION OF THE TIME PERIOD FOR ACCEPTING CERTIFICATION PETITIONS IS NOT ARBITRARY, CAPRICIOUS, OR CONTRARY TO LAW.

To the extent Plaintiffs challenge the DOL's determination that the appropriate

time period within which an employer may file a labor certification petition is 120 days or

less from the date the workers are needed, their challenge is without merit.  The statute

assigns DOL the duty to determine whether domestic workers are available or unavailable

to perform the temporary services that applicants seek to fill with temporary foreign

workers.  8 U.S.C. § 1101(a)(15)(H)(ii)(b), 8 U.S.C. § 1184(c).  DeHaan decl. § 5.

The DOL has determined that the appropriate point in time to make the determination is

is 120 days or less before the employers need the labor.   8 C.F.R. § 214.2(h)(6)(iii); see

DeHaan Decl. § 11.  This determination is set forth in a formal guideline document, GAL

01-95.  Id. ¶ 6.  60 Fed. Reg. 7216, 7217 (1995).  The 120 day requirement reflects

DOL's experience that an adequate test of the domestic labor market for temporary

positions cannot occur more than 120 days (four months) in advance of the date of need

16

and that DOL would not be able to meet its responsibility to determine domestic worker availability any earlier. DeHaan decl. §§ 10-11. Determination of the labor market is, of course, within DOL's expertise, and its internal guideline regarding the applicable time period appropriate for assessing domestic worker availability is entitled to respect as a permissible implementation of the statute. See Reno v. Koray, 515 U.S. 50, 59 (1995).

## IV. THERE IS NO BASIS FOR PLAINTIFFS' CLAIM OF CONSTITUTIONAL VIOLATIONS

Plaintiffs complain that the H-2B temporary workers program is "unconstitutionally preferential," in that Plaintiffs failed to receive benefits that earlier-applying employers received. The baseless nature of this claim is evident from the First Circuit's holding in Elton Orchards, Inc. v. Brennan, 508 F.2d 493, 498 (1st Cir. 1974). In that case, plaintiff requested DOL certification to hire temporary foreign agricultural workers, who were very experienced, to harvest apples. DOL denied permission on the grounds that domestic workers were available. Plaintiff argued that it was entitled to the certification because it had traditionally been certified to hire apple pickers from the West Indies and because other growers had been granted certifications to import foreign workers. The Court of Appeals held that DOL's

> [D]ifferential treatment of growers neither implicates a fundamental right, nor creates a suspect classification. Our inquiry need go only far enough to determine that there existed a rational basis for appellants' actions.

508 F.2d at 498. The Court went on to state,

17

> It may be that a system which apportioned domestic workers among the various employers submitting clearance orders would afford greater fairness to the employers, but as long as there is a rational basis for the operation of the system in its present form, inequitable or wasteful results argue for pragmatic reforms rather than adjudications of unconstitutionality. We can conceive of rational bases for the separate treatment of the clearance orders of individual employers. It may be simpler for the Department of Labor and the state employment services to handle separate orders, and more efficient to arrange for the transportation of a group of workers to a particular orchard on a particular date. Further, the present manner of operating the ICS may be the most consistent with the desire to protect domestic workers, which underlies all of the statutory provisions here at issue.

Id. Accordingly, the fact that Plaintiffs in this case were treated differently than employers who applied earlier for admission of foreign workers, is no basis for Plaintiffs' claim that Defendant's conduct was unconstitutional. Id. As the Court observed, "[i]t is idle to assert at this time in our history that because it results in unequal benefits to different persons, a federal statute which is rationally based is unconstitutional." Id.

There is no constitutional infirmity to the Defendant's administration of the H-2B program merely because latecomers miss benefits that earlycomers receive. Sec'y of Agriculture v. Central Roig Refining Co., 338 U.S. 604, 612 (1950). In Central Roig, the Supreme Court held that the choice among plans for allotment of sugar among refiners, which the Secretary of Agriculture made based on his choice of a representative base period, was constitutional. Id. The Court noted that many factors could have been used by policymakers at the Department of Agriculture to fix sugar quotas and that the ultimate

18

choice was highly complicated. "The Act may impose hardships here and there; the incidence of hardship may shift in location and intensity. It is not for us to have views on the merits of this legislation." Id. at 619. The allotment of statutory benefits was for the Secretary to make, provided that the choice had a rational relation to the statutory goals. Id. at 612. The Court held that the Due Process clause of the U.S. Constitution was not called into play by discrimination experienced by some sectors of the market as a result of the Secretary's allotments. Id.[14] After all, treating different groups differently is constitutionally inoffensive, unless wholly irrelevant to achievement of the objective of the statute. McGowan v. State of Maryland, 366 U.S. 420, 1104 (1961).

There can be no doubt that the 66,000 statutory limit on H-2B foreign workers is rational. The purpose of the statute imposing numerical caps on admission of temporary foreign workers is to protect domestic workers who may be deprived of jobs. Id. at 498. The policy permeates the immigration statutes, that "domestic workers rather than aliens be employed wherever possible." Id. at 499. Congress first imposed caps with the Immigration and Nationality Act of 1990, Pub. L. 101-649, 101st Cong., 2nd Sess. § 205(a), including the 66,000 cap per fiscal year on H-2B temporary workers. Congress determined, in passing the amendments to the INS, that while "[t]he availability of certain categories of nonimmigrant visas has enhanced trade and accommodated useful

---

[14] The Court noted that the agency's lawful decisions regarding sugar allotment could result in hardship by location or by latecomers versus early comers.

19

movement of people and products . . . other categories . . . have been abused. House Rep. No. 101-723(I), 101st Con., 2d Sess. (1990), 1990 USCCAN 6710, 6746-47. Numerical limitations were established for "three categories of temporary aliens: Entertainers and athletes-9,000; specialty occupations-25,000, and nonagricultural temporary workers-66,000. . . . Unwarranted administrative expansion of the statutory terms in those admissions" needed to be controlled. Id. Congress choose specific quotas as a way to control the administrative tendency to expand the number of temporary workers admitted. House Report No. 101-955, 101st Cong., 2nd Sess., 1990, 1990 USCCAN 6784, 6790-91 (Conference Report). The imposition of a numerical cap is thus rationally related to the goal of protecting domestic labor.

Defendants' administration of 8 U.S.C. § 1101(a)(15)(H)(ii)(b) is consistent with congressional intent that "[t]hese visas shall be issued on a first come, first served, basis," H. Rep. No. 101-723(I), 101st Cong., 2nd Sess. (1990), 1990 USCCAN 6710, 6726, and is rationally related to the legislative goal that the limit be administered in straight-forward fashion without the need for complex formulas and resource-intensive fact-finding. No more is needed to pass constitutional muster.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismised because Plaintiffs have set forth no basis for their claims. Defendant has administered the H2-B temporary

foreign worker program in compliance with the statute, the applicable agency rules, and

the Constitution.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney


_Anita Johnson_

ANITA JOHNSON
Assistant U.S. Attorney
Suite 9200
Moakley United States Courthouse
One Courthouse Way
Boston, Mass. 02210
617-748-3266

### Certification of Service

I hereby certify that I have served the foregoing upon Alan Feiner, counsel for
Plaintiffs, by first class mail, postage prepaid, on this 27th day of September 2004.

_Anita Johnson_

21