UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11002-GAO

DAYLILY FARMS, INC., a Massachusetts Corporation;
THE BAGEL AUTHORITY, INC., a Massachusetts Corporation,
JERRY WIENER, JOAQUIN DA SILVA d/b/a/ M.V. BROTHERS PAINTERS;
and ANTONIO SILVA d/b/a TROPICAL CATERERS,
Plaintiffs,

v.

ELAINE L. CHAO, Secretary, United States Department of Labor;
EDUARDO AGUIRRE, JR., Director, United States Citizenship and Immigration Services;
and ALICE SWEENEY, Director, Division of Career Services,
Massachusetts Department of Labor and Workforce Development,
Defendants.

MEMORANDUM AND ORDER
February 22, 2005

O'TOOLE, D.J.

Suppose you ran a landscaping or food catering business on Martha's Vineyard. One thing you would expect would be that your business would be much more active in the summer months than in the winter, and as a consequence you would need to employ more workers in the summer to accommodate the increased business than you would need to employ in the winter. You might be able to hire the additional workers in the local labor market, but if that were not possible, either you would have to attract workers from some distance away to come to the Vineyard for the season or you would be compelled because of an inadequate workforce to forego the full extent of the available business opportunities. To accomplish the former, you might be able to find enough prospective employees within the domestic workforce, but if not, you might seek literally to import seasonal workers from abroad.

Bringing foreign workers into the United States implicates both immigration and labor policies established and administered by the legislative and executive branches of the national government. In fact, those branches have addressed the matter of foreign seasonal employees in rather meticulous detail, as will be seen in the following discussion.

The plaintiffs, who operate Martha's Vineyard businesses that typically experience summer seasonal increases, consider themselves, apparently correctly, to be disadvantaged relative to certain other seasonal employers by the way the process operates that is established by statutes, regulations, and agency practice for getting permission to bring temporary foreign workers into the United States. By this lawsuit, they seek to force a change in the way that process operates, and to show entitlement to that relief they seek to establish that the process is in its design and/or execution unlawful. While they have succeeded in highlighting the problem they face, they have not outlined any plausible theory for concluding that either Congress or the respective executive departments have acted in violation of established constitutional law or other potentially applicable legal principles.

Examination of the issues presented begins with the recognition that through the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, Congress has set the basic rules governing whether and under what conditions non-citizens, or "aliens" to use the term of art, may enter and remain within the United States. Of direct pertinence to this case is a provision permitting the admission as a "non-immigrant alien" of a person "having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform . . . temporary service or labor if unemployed persons capable of performing such service or labor cannot be found in this country." Id. § 1101(a)(15)(H)(ii)(b). To be admitted, such a person must obtain an "H-2B visa," so named by

reference to the authorizing statutory provision. Congress has limited the number of H-2B visas that may be issued in any given fiscal year to a national total of 66,000. Id. § 1184(g)(1)(B).[1]

So, in order to hire non-immigrant alien workers for their summer season, the plaintiffs need to see to it that each of their prospective employees is issued one of the limited number of H-2B visas available each fiscal year. While the actual visas are issued by the Department of State, the Department of Homeland Security through the U.S. Citizenship and Immigration Services has the responsibility of determining whether to authorize the issuance of H-2B visas. See id. § 1184(a) (granting such authority to the Attorney General) and the Homeland Security Act of 2002, § 428, 6 U.S.C. § 236 (2004) (transferring functions of the Commissioner of the Immigration and Naturalization Service formerly within the Department of Justice to the Department of Homeland Security); see also 8 C.F.R. §§ 214.1, 214.2.

Eligibility for an H-2B visa is dependent on the existence of the condition expressed in the statute itself: that "unemployed persons capable of performing such service or labor cannot be found in this country." 8 U.S.C. § 1101(a)(15)(H)(ii)(b). Enter the Department of Labor. "Prior to filing a petition with the director [of Citizenship and Immigration Services] to classify an alien as an H-2B worker, the petitioner shall apply for a temporary labor certification with the Secretary of Labor . . . ." 8 C.F.R. § 214.2(h)(6)(iii). See also 8 U.S.C. § 1184(c) (requiring the participation of the Department of Labor). Upon application, the Secretary of Labor may either (1) certify that qualified workers in the United States are not available and that the employment of foreign workers will not adversely affect the wages and working conditions of similarly employed United States workers or (2) explain why such a

---

[1] Although the statute does not say so in so many words, there can be no question that the "fiscal year" referred to is the government's fiscal year, which begins annually on October 1.

certification cannot be made. 8 C.F.R. § 214.2(h)(6)(iv)(A). That step accomplished, the would-be employer of the foreign workers then submits a petition to U.S. Citizenship and Immigration Services for approval of H-2B status for the workers, either relying on the Labor Department's certification or, if certification was withheld, seeking to convince the director of Citizenship and Immigration Services to grant the status anyway.

Two other provisions regarding the processing of the petition within U.S. Citizenship and Immigration Services deserve mention. First, the labor certification is good only for one year, so that each year the employer needs to get a new certification. 8 C.F.R. § 214.2(h)(6)(iv)(B). And second, petitions for approval of H-2B status are considered in the order in which they are filed, id. § 214.2(h)(8)(ii)(B), so that the earlier a petition is filed, the more likely it is that it will result in the issuance of a visa, given the limited number of H-2B visas available nationally in any year.

To this point, the plaintiffs say they have no problem with the process. They raise no objection to the conditioning of the approval of H-2B status on findings about the local labor market, nor to the cap on the number of H-2B visas that might be issued annually, nor to the first-come, first-served method of processing petitions standing alone. What they object to is the effect of the convergence of the Homeland Security procedures and the Labor Department procedures, and that effect is that the plaintiffs are, as a practical matter, shut out of the competition for H-2B visas.

As noted, under Homeland Security procedures, the plaintiffs cannot file a petition for approval of H-2B status until they have obtained action from the Labor Department on their application for a temporary labor certification.[2] The rub is that, under Labor Department practice, they may not file an

---

[2] Strictly speaking, the application is made in the first instance to the state employment security agency (SESA) serving the area of proposed employment for some preliminary findings concerning prevailing wage rates, availability of domestic workers, and the like. After processing by the SESA,

application for a labor certification earlier than 120 days before the beginning of the period of proposed employment of the foreign workers. See Department of Labor, General Administrative Letter 01-95 ("Procedures for H-2B Temporary Labor Certification in Nonagricultural Occupations"), 60 Fed. Reg. 7216 (Feb. 7, 1995) at § III.D.  Consequently, those prospective employers who need workers earlier in any given fiscal year – the winter season, for instance – can process their Labor Department applications earlier and thereby get in line at Homeland Security earlier, and conversely, those employers who do not need workers until later in the year – the summer season – have to wait to get in line with the risk, and recently the reality, that by the time they are able to file a petition for an H-2B visa, the annual cap has been reached and the petition will be automatically rejected.  As the plaintiffs put it, the race is over before they are permitted to stand at the starting line.

One can understand, even sympathize with, the plaintiffs' predicament.  But here, in this forum, the question must be asked, What have the defendant agencies done that is unlawful?  To this question, the plaintiffs do not have an adequate, nor even a coherent, answer.

In both their amended complaint and in their opposition to the pending motion by the defendants to dismiss the action for failure to state a claim upon which relief can be granted, the plaintiffs invoke the Declaratory Judgment Act, 28 U.S.C. § 2201, seeking apparently a declaration that the defendants' administrative practices are "inequitable."  The Declaratory Judgment Act provides a procedure for resolving certain kinds of controversies, but it is not a source of substantive rights in itself.  See Colonial Penn Group, Inc. v. Colonial Deposit Co., 834 F.2d 229, 232 (1st Cir. 1987).

---

the application is forwarded to the appropriate regional office of the Employment and Training Administration of the Department of Labor.  Because of the participation of the state agency in the process, the plaintiffs had originally joined the Massachusetts Department of Workforce Development as a defendant in the case.  The plaintiffs subsequently stipulated to the dismissal of the complaint as against the state agency.

In their opposition to the motion to dismiss, the plaintiffs argue that "[t]here was no rational basis for the Defendants' actions." Pls.' Mem. in Support of Opp'n to Defs.' Mot. to Dismiss, at 7. At oral argument, they contended that the defendants' actions were arbitrary and capricious. This has the sound of a constitutional argument, and sure enough, the amended complaint does make reference, without much elaboration, to the "Due Process Clause of the Fifth Amendment (and the equal protection principles it incorporates)." Am. Compl. ¶ 5. One of the amended complaint's prayers for relief is that there be a declaration "that the regulatory scheme and policy of the Defendants is inequitable and unconstitutionally preferential." Id., prayers for relief, ¶ 2.[3]

The plaintiffs fail to offer a developed argument about any such constitutional theory. To the extent that their contention is that the policies are unconstitutionally preferential – presumably preferring winter seasonal hirers over summer seasonal hirers – there are a couple of responses that can be made. First, of course, there is no indication whatsoever that any such preference was purposely intended or that the various regulatory processes were designed to effectuate one. To the contrary, the plaintiffs' relative disadvantage appears rather to be the unintended consequence of the confluence of policies adopted for different and more limited reasons. Moreover, absent some basis for concluding that a winter-versus-summer distinction would be invidious in the constitutional sense, the distinction even

---

[3] The amended complaint may also be read to allege that the Department of Labor's policy of declining to consider any application for a temporary labor certification if it is filed more than 120 days prior to the proposed employment was adopted in violation of the Regulatory Flexibility Act, 5 U.S.C. §§ 601 et seq, and/or Presidential Executive Order 13,272 (Aug. 13, 2002) (requiring agency compliance with the RFA). It is probably the case that the RFA does not apply to the adoption of application processing deadlines by means of a general administrative letter, as opposed to a formal rulemaking. See 5 U.S.C. §§ 611(a)(1), (a)(2) and 601(2). In any event, because the plaintiffs have not presented any argument at all based on the RFA in response to the motion to dismiss, the claim (if there was one) is deemed abandoned.

if intended would be permissible so long as it rested on *some* rational predicate, see, e.g., Williamson v. Lee Optical of Oklahoma, 348 U.S. 483, 489 (1955); Sec'y of Agriculture v. Cent. Roig Refining Co., 338 U.S. 604, 612 (1950), with deference being given to the agencies in judging whether rationality was present. See, e.g., INS v. Aguirre-Aguirre, 526 U.S. 415, 424-25 (1999); Reno v. Flores, 507 U.S. 292, 305 (1993); Chevron U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984). Finally, and not unimportantly, when a similar theory was advanced some years ago to the First Circuit, that court flatly rejected it. See Elton Orchards, Inc. v. Brennan, 508 F.2d 493, 498 (1st Cir. 1974) ("[D]ifferential treatment [of growers] neither implicates a fundamental right, nor creates a suspect classification. Our inquiry need go only far enough to determine that there existed a rational basis for appellants' actions.").

So the nub of the matter comes down to whether the plaintiffs have any plausible claim that the policies adopted by the respective agencies are not rationally related to any legitimate regulatory objective. They do not. It is rational to condition the admission of temporary foreign workers to the United States on a finding that domestic workers are not available to fill the existing need. It is rational to set a ceiling on the number of temporary foreign workers admitted on an annual basis. There is no suggestion that it is irrational to have set that ceiling at 66,000 workers. It is rational for an agency to order its processing of petitions so that they are considered in the order in which they have been filed. It is rational to conduct the inquiry into the conditions in the local labor market at a time proximate to the proposed date of employment. The plaintiffs proffer no basis for finding irrational the Labor Department's determination that the prospect of short-term swings in local labor conditions make it advisable to conduct the inquiry within four months of the proposed commencement of employment.

So taken individually, each of the agency rules or policies involved has a rational basis and is thus not eligible for judicial invalidation. In the end, what the plaintiffs seem to be suggesting is that when the several legitimately adopted and rationally based rules and policies operate together to cause an adverse consequence to them relative to others more or less similarly situated, the resulting unfair "disparate impact" of the combined rules and policies itself justifies judicial relief. It is an interesting theoretical proposition, but it is one without any support in existing constitutional precedent.

The defendants' motion to dismiss the complaint for failure to state a claim upon which relief can be granted is ALLOWED. The action is DISMISSED WITH PREJUDICE.

It is SO ORDERED.


| February 22, 2005 | \s\ George A. O'Toole, Jr. |
| --- | --- |
| DATE | DISTRICT JUDGE |